**BUCHANAN et al. v. DAVIS et al.**
**(Nos. 1145–5099.)**

Commission of Appeals of Texas, Section A.
Jan. 23, 1929.

Robert Thompson and C. F. Greenwood, both of Dallas, John B. Howard, of El Paso, and Black & Graves, of Austin, for plaintiffs in error.

Coates & Mastin, of Fort Worth, for defendants in error.

NICKELS, J. The will of Ophelia Buchanan was attacked for absence of testamentary capacity and presence (and procuring effect) of undue influence. The jury sustained both charges, and the judgment nullifying the will was affirmed by the Court of Civil Appeals. 300 S. W. 985. Writ of error was allowed each of two groups of appellants upon petitions claiming error in matters hereinafter discussed.

1. Jurisdiction of the district court is lacking, it is said, because there was no final judgment of the county court in probate. Except for recitals immaterial here and one to be mentioned, the judgment of the county court is set out in the opinion of the Court of Civil Appeals. 300 S. W. 985, 987. It discloses presence and consideration: (a) Of a "plea in abatement" by one group of defendants and a "special exception" by another asserting the bar of four years' limitation, whose perfection, it was said, appeared in the face of the petition; (b) of a "special exception" directed at lack of indispensible parties.

Recital of the questions then presented and of the judge's opinion touching same having been made, it was then (and "therefore") "ordered, adjudged and decreed * * * that the plaintiffs take nothing by their contest and that the defendants go hence without day and that they recover of the plaintiffs their costs."

That was a final judgment within the meaning of the cases cited by plaintiffs in error (e. g., Hanks v. Thompson, 5 Tex. 6; Bradshaw v. Davis, 8 Tex. 344; Hughes v. Lane, 25 Tex. 356, 367; Texas Land & Loan Co. v. Winter, 93 Tex. 560, 57 S. W. 39), for

the "consequence of the ruling," on plea and exceptions, "to the parties was declared" (T. L. & L. Co. v. Winter, supra).

Outside the decretal, and recitals, mentioned, the judgment presents indicia of intent for its finality of disposition of the rights of the parties, for the "plea in abatement" and one of the "exceptions" were treated as presenting matter in bar and not merely in delay or postponment. So much is declared or implied in a recitation (not included in reproduction of the judgment in the opinion of the Court of Civil Appeals), immediately preceding the decretal, that "plaintiffs * * * requested the right to present testimony on each and all the issues as contained in their amended petition * * * upon which they went to trial which request was refused by the court for the reason that the introduction of said testimony would be immaterial because of the court's ruling on the plea in abatement and the special exceptions." Cf. Last Chance Min. Co. v. Tyler Min. Co., 157 U. S. 683, 690, 15 S. Ct. 733, 39 L. Ed. 859.

2. Perfected bar of four years' limitation (articles 5534 and 5536, R. S. 1925) is asserted as a reason why verdict for plaintiffs in error should have been instructed. And error is predicated upon the judge's refusal to give certain "special issues" relating to defense of limitation.

The case is governed by the statutes as they existed prior to the 1925 codification and re-enactment. Accordingly, the defense is not available as against those defendants in error who were minors during the prescriptive period. Article 5708, R. S. 1911; article 5708, Vernon's Sayles' Tex. Civ. Stat. 1914; Kopperl v. Sterling (Tex. Civ. App. writ denied) 241 S. W. 553; Stephens v. Leatherwood (Tex. Civ. App.) 295 S. W. 236. Whether it would be available in respect to a charge of "undue influence," as "fraud," under present article 5536, R. S. 1925, in view of the re-arrangement of old article 5708, R. S. 1911 (see articles 5534, 5535, and 5518, R. S. 1925), is presently an immaterial question. Validity of the will as evidence (may be source) of rights, and not rights of themselves, is the subject of litigation, and, because of the necessity of the adults as parties and the general effect of annulment of a will at the suit of any party, the disability of some of the contestants precluded the defense as against the others.

3. Undue influence was not issuable, it is said, and hence verdict for plaintiffs in error ought have been directed. The matter as presented has a double aspect, with an incidental phase arising on admissibility, vel non, of certain testimony; it will be considered in its several relations.

And, first (1), concerning the fact of exertion, or attempt to exert, such influence: Testatrix and husband were possessed of a community estate, it appears, of substantial value. There is evidence to support an inference that each of them had a separate estate in property included in the mass, of which community property made by far the larger part. Testatrix was the mother of children by a previous husband, as also of children of the present husband.

That testatrix and husband intimately discussed and considered testamentary dispositions is not questionable. To this reference is made by the husband in a letter addressed to A. J. Buchanan (one of the first group of children) about two months after death of testatrix, in these words:

"Your mother was very free and pointed in saying she wanted you to have something, but did not say how much. Then, I suggested a thousand dollars, which was perfectly satisfactory. One hundred to Clarence" (another of the first set of children), "saying it was useless to give him anything owing to the fact it would be spent for whisky."

Mrs. Tennie Buchanan testified to a "conversation * * * about the provisions of the will" had with Mr. Buchanan, surviving husband of testatrix, a short time after date of the letter just mentioned in which "he said Clyde Buchanan" (one of the second group of children) "was willed $25.00 just to get by * * * I willed Clyde $25.00 to just get by." This had reference to a bequest in Mrs. Buchanan's will. And there is evidence supporting inference of bad feeling (on Mr. Buchanan's part) toward Clyde.

In the first and second sentences of that part of the letter quoted, Mr. Buchanan plainly declared his exercise of influence in determining the amount, etc., of property to be given A. J. Buchanan. In the third sentence, language was used which bears that interpretation (in light of its context and in view of the bequest actually made) which imports direct exertion of influence touching nature and amount of "gift" to "Clarence." In his testimony, Mr. Buchanan stated or implied that the third sentence, as quoted, meant, or was intended to mean, that his wife had decided upon $100 as the amount of this bequest, and that she was author of the statement, "It was useless to give anything owing to the fact it would be spent for whisky." That explanation, however, was not conclusive, as is manifest.

In the first part of the excerpt of testimony of Mrs. Tennie Buchanan, Mr. Buchanan is made to declare as a fact the motive which actuated his wife in relation to Clyde. He denied making any such statement to Mrs. Tennie Buchanan; hence there was lacking explanation by him that any statement by his wife was source of his knowledge of her motive. In consequence, his first statement might be taken as implying that which his second declaration states—that is, that, while the manual act was that of his wife, it did but represent his own will, for he is made to say, "I willed Clyde $25.00 to just get by."

The declarations thus made in the letter by Mr. Buchanan and those attributed to him by Mrs. Tennie Buchanan make up evidence of use of influence by him in respect to subject-matter of the will. And other testimony shows that the transactions mentioned in the letter and in his statements to Mrs. Tennie Buchanan, as related by her, occurred in immediate relation, in time and manner, to actual preparation and execution of the document.

The jurors were free, of course, to attribute to Mr. Buchanan the declarations contained in the letter as also the declarations charged to him by Mrs. Tennie Buchanan; upon doing that, they might reasonably find direct use of influence. And whether exerted influence thus found was due or undue is a question which at once directs attention to the probabilities of effect (knowledge of chances in that regard being imputed to the person using influence), since an actual result may be viewed as an intended result if, as circumstanced, it was a likely result. See Soon Hing v. Crowley, 113 U. S. 703, 710, 5 S. Ct. 730, 28 L. Ed. 1145.

Hence mental state has relevancy in the present inquiry, for it, whatever it was, conditioned the use of such influence as was employed. And, while the direct inquiry here is about intellect and not physique, and while physical decrepitude is not sufficient of itself to import disorganized mentality or abnormal susceptibility (McIntosh v. Moore, 22 Tex. Civ. App. 22, 53 S. W. 611, 615; Gallagher v. Neilon [Tex. Civ. App.] 121 S. W. 564, 568, 569; Salinas v. Garcia [Tex. Civ. App.] 135 S. W. 591), yet nature has imposed that union of mind and matter whose delicate interrelationship may not be ignored. It is known of us all that whatever hurts the flesh reacts somewhat upon the media of intelligence; and the idea that injury to or impairment of one part of the finely poised organism does not to some extent impair all others has repudiation in the general experience and observation of mankind. In consequence, physical condition is a circumstance entitled to consideration in ascertainment of intellectual state. Johnson v. Ry. Co., 36 Tex. Civ. App. 487, 81 S. W. 1198; Bradshaw v. Brown (Tex. Civ. App.) 218 S. W. 1071, 1075; Ellis v. Mathews, 19 Tex. 390, 398, 70 Am. Dec. 353.

The will was signed August 3, 1917. August 17, 1917, testatrix was put on a train for Colorado. She died in Colorado August 20, 1917. Her condition "about a month" before she was sent to Colorado is thus generally described in testimony of Mrs. Tennie Buchanan:

"She was in an extremely weakened condition, she could not walk but just a little bit at a time. * * * She had a rattle in her throat,—well, it was just like somebody * * * that had pneumonia, she couldn't breathe, she breathed with difficulty. She was as pale as death and her face was drawn and her eyes were just sunken in her head, the veins were prominent. Every part of her body that was visible was blue. * * * She suffered all the time, appeared to be suffering all the time, all up here through the chest."

During the two days immediately preceding departure for Colorado, testatrix, according to Mrs. Tennie Buchanan, was in that condition implied by this language:

"She was worse. * * * She was on the bed, not able to be up, just barely able to sit up for a few minutes on the bed all the time and very sick. She could say very little and her voice was just above a whisper. Could not hear her easily when I was fifteen or twenty feet away from her. Could not carry on connected sentences at that time. She could just say one or two words at a time and then rest. * * * She was pale, her face was drawn and her eyes sunken. * * * When she left for Colorado Loleta, my daughter, and I helped dress her. We put on her hose just a little bit at a time and she would have to lie back and rest and close her eyes. It took about an hour to get her dressed. We put on one garment and she would rest and then we would put on another. At that time she weighed ninety pounds—her normal weight was about one hundred and forty pounds."

In February, 1917, Dr. Samuell "diagnosed her trouble which was cancer of the breast" and "removed her breast"; there was "a recurrence of cancer," he said, "which means a loss of strength in its final stages, a pale bloodless condition of the skin, which is characteristic of cancer in its final stages—almost invariably in the latter stages they are very painful." There is evidence given by others, amongst them Mr. Buchanan, to support an inference that the cancerous condition may have been developing throughout at least six years. There is testimony about other ailments. And, of course, there is testimony of a state of health better than that depicted by Mrs. Tennie Buchanan.

"Old age," of itself, does not prove weakened, etc., mentality (Millican v. Millican, 24 Tex. 427, 430; 8 R. C. L. 944) or raise an issue, but it is recognized as being, ordinarily, an infirmity of such nature, as that it may, and oftentimes does, both produce, or contribute to cause, and evidence a correspondent intellectual decline (Ellis v. Mathews, supra; Johnson v. Ry. Co., supra). As a criterion of mentality, age is uncertain; because it is so, and yet because there is an undoubted relationship, the law arbitrarily names a period of minority and inhibits contractual effect during its existence as also exhibits "great tenderness" for the act of an old person when it does not appear to be the result of imposition and when it makes those dispositions which the circumstances of the "situation and the course of the natural affec-

tions" dictate. In years Mrs. Buchanan was about 70 when the will was signed; in concomitant infirmity, a juror might have envisioned her as having been old far beyond her years.

There were memory lapses—indices, maybe, of impaired intellectuality. Cf., Cockrill v. Cox, 65 Tex. 669; Schouler on Wills, §§ 148, 150. Mrs. Tennie Buchanan, in connection with the testimony above excerpted, said of testatrix: " * * * In talking she could not remember things that happened until after I would remind her of them. She could not remember names," etc.

■ Mrs. Tennie Buchanan said of testatrix: "Her mind was weak." This statement was made in immediate connection with her testimony about testatrix's physical condition and memory lapses shown above. The fact of long and intimate acquaintance, with ample opportunities for observation, appeared. The witness then "detailed the facts upon which her opinion was based," and the opinion was entitled to consideration (Brown v. Mitchell, 88 Tex. 350, 365, 367, 31 S. W. 621, 36 L. R. A. 64), and its value was for the jury. We say this here because of insistence that Mrs. Tennie Buchanan's statement is incompetent and that it must be eliminated (Henry v. Phillips, 105 Tex. 459, 151 S. W. 533) in determining whether the issue be raised.

And to the sum of those things there must be added the force of these circumstances: (a) Declarations of love and concern for children practically disinherited, especially in respect to Clarence (i. e., dispositions which a juror might well regard as unnatural); (b) fixed opposition to such a will as was made; (c) ill feeling, perhaps unwarranted, on the part of Mr. Buchanan and toward some of the children. See cases cited in the opinion of the Court of Civil Appeals; Morris v. Morris (Tex. Com. App.) 279 S. W. 806.

(2) In view of conclusions reached touching its admissibility, the effect of the testimony discussed under (3) below must be added to the effect of the evidence related in (1) above in determining the question of issuability of the result of whatever influence was used.

■ (3) Mrs. Tennie Buchanan was allowed to testify that a short time, say, a month, before her death August 20, 1917, testatrix stated to her "that Mr. Buchanan" (husband of testatrix and a beneficiary) "would just nag, * * * was nagging the life out of her to make her sign a joint will but she would never do it as long as she was in her right mind and she feared that he would continue nagging at her until she would grow so weak and be so weak minded that she would sign it but (she said) 'as long as I am in my right mind I will never do it.'" Like statements were made by testatrix, according to the witnesses, at various times during two or three years preceding her death.

Mrs. Vann was allowed to testify that at a date about one year previous to death testatrix stated: "Billy" (i. e., husband of testatrix) "is nagging me to death trying to make me sign this old joint will, but I will never do it."

Miss Porter, another sister, was allowed to testify that in October preceding death of testatrix August 20, 1917, testatrix said to her: "You know more about this business than anybody, you have lived there with us, and you know that Billy" (husband of testatrix) "has nagged me to sign it, and I will never sign it as long as I am in my right mind."

Upon motion of plaintiffs in error, the jurors were instructed "not to consider the testimony * * * as proving or tending to prove that W. M. Buchanan attempted to unduly influence" his wife, and that they might consider it "only to show the effect on her mind, if it does."

The testimony consists alone of narratives of events, it is said, and hence is forbidden hearsay within the meaning of Scott v. Townsend, 106 Tex. 322, 337, 166 S. W. 1138.

The example of improper hearsay given in Scott v. Townsend is relation of a declaration by the testator that "his wife * * * had been after him to make a will." That language, it was held, did not indicate any effect or the nature of the effect, if any, on the testator's mind.

But, if I say that some person has "nagged me," I say or imply that I have been "irritated by persistent urging," "persistently annoyed," "disturbed," "ruffled in mind," "wearied," or "troubled," etc. And, while I do relate an effort by that person, I disclose an effect produced by the effort. If I add a declaration of present and continued opposition to the thing sought by "nagging," I do but emphasize the presence of a state of mind—i. e., the fact of an effect. And when, having related the effort and an effect, I express fear of succumbing, my present determination notwithstanding, I suggest "awe" upon my part.

It seems to us that the testimony indicates a response by Mrs. Buchanan to importunities—i. e., her mental condition—and, hence, as limited, is competent. Scott v. Townsend, supra; Zibble v. Zibble, 131 Mich. 655, 92 N. W. 348; Rambler v. Tryon, 7 Serg. & R. (Pa.) 94, 10 Am. Dec. 444. In Roberts v. Trawick, 17 Ala. 55, 52 Am. Dec. 164, it appears that a witness was permitted to testify that he heard testator declare, a short time before making his will and in presence of his wife, the beneficiary, that "all I can hear from some people is, 'a will, a will, a will,' but the laws of Alabama make a better will than I or anybody else can make." Because of presence of the wife, the testimony was allowed in proof of the fact of undue exertion of influence. The case is cited here because in the opinion of the court, in Roberts v.

Trawick, the testimony "tended to show * * * agitation and mental embarrassment" on the part of testator.

On cross-examination by counsel for plaintiffs in error, Mrs. Tennie Buchanan was asked about that conversation, and, amongst other things, said: "I have testified on direct examination that Mrs. Buchanan in substance said to me on various occasions that W. M. Buchanan 'is trying to get me to sign a joint will and if I ever sign it you will know I am out of my right mind.'" On redirect examination by counsel for defendants in error, she said that on the occasion referred to (i. e., about a month before death) testatrix declared that "Mr. Buchanan was nagging at her and trying to get her to sign a will and that she would not do it."

Mrs. Vann first stated that testatrix had said to her "something like" this: "Billy" (i. e., W. M. Buchanan) "wants us to make a joint will, but I will never do it." Thereupon she gave the version set out above—i. e., "Billy is nagging me to death trying to make me sign this old joint will, but I will never do it." Miss Porter first said that testatrix stated Mr. Buchanan "was wanting her to sign this will." Miss Porter then said, "I want to repeat it just exactly how she said it if I can." Thereupon she undertook to repeat the words used by testatrix as set out above—i. e., "You know more about this business than anybody, you have lived there with us, and you know that Billy has nagged me to sign it, and I will never sign is as long as I am in my right mind."

That part of the testimony, on redirect examination, of Mrs. Tennie Buchanan, in which testatrix is made to say that "Mr. Buchanan was * * * trying to get her to sign a will," separately considered, is probably within condemnation of Scott v. Townsend, supra, as is that part of the testimony of Mrs. Vann wherein the words, "Billy wants us to make joint will," are attributed to testatrix, and as is also that part of Miss Porter's testimony to effect that testatrix said "Mr. Buchanan was wanting her to sign this will." But the matter is affected by various considerations rendering the supposed error innocuous: (a) In respect to that part of the testimony of Mrs. Tennie Buchanan, it is noticeable, counsel for plaintiffs in error, on cross-examination, drew from her the statement testatrix had said that "W. M. Buchanan is trying to get me to sign a joint will"; the latter statement, of course, is not within the exceptions taken. (b) Of these portions of the testimony of Mrs. Vann and Miss Porter two things are observable: First, testimony of like effect was drawn from Mrs. Tennie Buchanan on examination by counsel for plaintiffs in error and is in the record without exceptions preserved; and, secondly, Mrs. Vann and Miss Porter each immediately corrected her statement through more exact repetition of the words used by testatrix. (c) The testimony disclosing the element of "nagging" and possible effect, already held to be admissible, necessarily brought to jurors ideas of Mr. Buchanan's "trying to get testatrix to sign a will" and "wanting testatrix to sign this will."

4. The jury found lack of testamentary capacity and presence of undue influence as cause of the will. The apparent incongruity is not presented for review; the contentions as made being lack of evidence to raise either issue. Our conclusion that undue influence in procuration was issuable renders consideration of the other contention immaterial, since the fact of undue influence, established by the verdict, amply supports the judgment.

5. Accordingly, we recommend affirmance of the judgment of the Court of Civil Appeals.

CURETON, C. J. Judgment of the Court of Civil Appeals affirmed, as recommended by the Commission of Appeals.